Thank you, Your Honor. May it please the Court. My name is Richard Landon. I'm here on behalf of Petitioner MFA Enterprises, who I will refer to as West Central Agri Services. We're appealing an ALJ's decision affirming an OSHA citation to West Central because we do not believe that West Central had a reasonable warning of when OSHA's regulations require workers to use fall protection atop rail cars or what kind of protection is necessary. OSHA issued a citation for a willful violation of its general PPE standard because it found evidence that workers atop rail cars at West Central's facility in Adrian, Missouri did not wear the fall protection equipment that was provided. This is a citation for which West Central now must pay a penalty of more than $122,000 and could increase future penalties because of this willful characterization. We argue below, as we argue here today, that West Central lacked fair notice that it could be cited for fall hazard under the general PPE standard when OSHA's standards for fall hazards under Subpart D do not apply to work atop rail cars. The ALJ disagreed, saying that fair notice was provided by what is referred to as the Miles Memorandum, a 30-year-old memo that was sent by the Director of OSHA to its regional administrators addressing fall protection from rolling stock, which the— Judge Pritzker Which has never been judicially reviewed. Mr. McKeon That is correct. It was not a rule promulgated. It was—we refer to it as an internal memorandum. I believe OSHA's counsel disagrees with that characterization, but it's a publicly available memo that was sent to regional directors. That memo indicated that the PPE standards could be used for citations in—for some work atop rail cars, but not for others. We believe that the ALJ's conclusion is wrong because OSHA itself has concluded that the Miles Memorandum, and this is a quote, did not result in clear direction to the public or to OSHA's field staff, end quote. That's from the 2010 Notice of Proposed Rule. If OSHA admits that the Miles Memorandum did not provide clear direction of how fall protections were covered by OSHA regulations, how could West Central have fair notice that it could be cited under that standard at issue here, let alone cited for a willful violation of the standard that it did not—would apply in this situation? I want to draw attention to two of the cases that were cited in our reply brief because I think that they're instructive here. One of them is the Hoffman construction case out of the Ninth Circuit from 1996. This was a case where construction workers were atop a structure 40 feet in the air and were cited for not using—not properly tying off their lanyards to prevent possible injury from a fall from that great height. And OSHA cited them under a standard that basically said that if the need to tie off the lanyard arises, then you have to tie off the lanyard. The Ninth Circuit— Was it a 132 standard? I'm sorry. Excuse me? Well, we're talking—we've been—all the briefs talk about 132 versus 140. This did not deal— It didn't exist. Was this a 132 charge? It was not dealing with 132. It was dealing with a separate regulation. The regulation was not the same as the one at issue in this case, but the Court's analysis of it is what we believe is relevant. The Court said that the bottom line of the regulation in that case seemed to be that the need to tie off safety lanyards arises when the need arises. No criteria are offered to evaluate this need. The Court concluded that that did not—was not sufficiently definite and certain to create punitive liability as represented by the fine in this case. As an abstract proposition, the Court certainly agreed that if you're potentially falling, but absent some more clear guidance of what protections were required, they did not believe that that standard was appropriate to issue the citation. We think the same case applies here, or we think that the standard here provides the same situation. The general PPE standard is a broadly worded performance standard that covers many different situations. And here it says that an employer is expected to do a hazard assessment to determine what hazards exist and whether any of them necessitate personal protective equipment, and then to provide the equipment that they have decided is necessary. This Court has said that when dealing with a broadly worded performance standard, it's important to look at industry practices. Industry practices are relevant. And here again is why we believe that there's no fairness. The Eighth Circuit case is the Jacob Field Services case, I believe, where it says that industry practices are relevant to a broadly worded performance standard. How about the fact that you had the safety, your client, excuse me, had the safety equipment, if you're talking about industry practices, had the safety equipment installed that was capable of handling, you know, the four rail cards? Yes. So is your question whether the fact that we had something installed was enough to... And your client was practicing safety measures, I mean, not implementing them, but certainly had the equipment set up to do so, and on occasion they were used. Is that relevant to your industry practices argument? Well, it's relevant, but we do not believe that the fact that the equipment was installed is indicative of what industry practices thought was necessary. The record demonstrates that the implementation of the fall protection system that was there was going above and beyond what was required. And again, the general performance standard requires an employer to determine what fall protection is necessary. The fact that they built a fall protection system doesn't mean that they thought that that system was necessary. We believe there's been no assessment in this case that establishes what was necessary in this case, and therefore, you know, what they would be held to use. What case says you've got a defense to an OSHA charge when you say, well, I knew about the rule, but I didn't think it was necessary in my situation? What case possibly says that's a defense? Well, I think that the pardon me, I'm trying to Well, I think you've just stretched this issue way out of cognition with that argument. Well, the case law says in the Hoffman case that I just discussed out of the Ninth Circuit discusses this, this is 546 F. 2nd. 281. And also the S&H Riggers and Erectors case out of the Fifth Circuit, 659 F. 2nd. Well, my Jacob Service opinion would not possibly support that argument. On the details of the decision. On the details of that decision, but the cases make clear that an employer has a right to know not just what regulation applies, but what is required by the regulation. And we don't think that that is met in this case. We don't think that there is It's not a defense to say, oh, I didn't think it required that. Well, I believe it is a defense, at least to the willful characterization, Your Honor, because the cases make clear that if in good faith I thought we were talking about the merits of the basic decision. Are we just arguing willfulness now? No, we're not just arguing willfulness. We believe that there is Okay, well, don't drag in the caboose when you're arguing about the locomotive. Well, are you done? When you have a language that says, wherever it is necessary by reason of the hazard, right? I mean, that's the language, right? And you have put in safety equipment, which indicates that you have recognized that the hazard exists, right? And there are actually instructions that people are supposed to use it, right? Because they were told that this safety, this equipment is here for your personal protection and you should use it. But it was difficult to use because, well, you know, we can get to the first two rail cars, but we either then have to move that train or we have to unhook. And it's just easier to just not use it, right? That's what caused this problem, right? Now, how does this recognition that this hazard exists, your instructions, how does that not just kind of plainly fall within whenever it's necessary by reason of the hazard presented? Well, again, there's no OSHA regulation that says when it's necessary. And our client believed that this was not necessary. It was going above and beyond what was required. The S&H Riggers case that I referred to talks about the idea that an obvious safety hazard itself is not enough to show the employer what it needs to do. In that case, the Secretary argued that where an obvious safety hazard exists, an employer is under an obligation to provide any personal protective equipment that is feasible. That's the same word we're dealing with in this case, feasible, that would eliminate and reduce the hazard. And the Court said that that's stretching the regulation too far. If the Secretary wants to make such a broad argument, it needs to do so through rulemaking. And it says that it's a faulty premise that the presence of an obvious hazard by itself gives notice of the need to provide safety belts or other protective equipment. Here, we have talked about how there are other safety measures in place, specifically prohibiting employees from being on top of rail cars while they're moving. This is specifically one of the practices that OSHA acknowledged in the industry could be effective to prevent fall hazards. So, yes, we did— I'm not making an industry-wide argument. I think this is an as-applied case, so you're not helping me at all. Well, again, the industry practice is relevant for the broadly worded— Of course it's relevant, but it doesn't answer this case. I understand that— Whether the Miles memo is valid and was properly applied. I understand your position, Your Honor. Who's your industry witness like there was in Jacob's Fields on both sides? I don't believe that there is a witness talking about general industry practices. So, the ball's been dropped already. Well, our witnesses talked about what we believe was appropriate, other safety measures in place that we believe were appropriate to prevent— You're not arguing that the safety system you had, I mean, it was feasible, do you agree? But you're just saying that, I mean, help me through that. I mean, clearly the safety mechanism that OSHA says you should have been using and you had and weren't using was feasible. You're just saying that, help me out here with what you're saying. Your Honor, I don't believe that there's clear guidance as to what feasibility means. Does feasibility mean physically possible, or does feasibility mean practical— That's why we have litigation. That's why this is an as-applied case. Well, I don't believe that there was evidence below of what the standard for feasibility was. And again, we believe that although the system— The standard is a general standard. Yes, Your Honor. It's got to be applied in difficult cases. Yes, and we— The standard review for that is what we should be talking about, not your legal arguments, because they don't fly. I understand, Your Honor. I see I'm running out of time. I wanted to reserve a moment for rebuttal. Not much time, but I will reserve it for rebuttal. Thank you, Your Honor. May it please the Court, Brian Broker for the Secretary of Labor. I'd like to clarify some of the things that my opponent brought up. I'd like to first just clarify how straightforward this case is. MFA was cited for— You'll never convince me of that. Yes, Your Honor. I mean, you can try with my colleagues, but this is not a straightforward case. I'm sorry. Well, let me try anyway, very briefly. I might be wrong, but you will never convince me of that. Yes, sir. So the standard that was cited here, 1910.132d.1i, is straightforward. It's a very common-sense requirement. If you've conducted a hazard assessment and you've identified a hazard that necessitates the use of personal protective equipment, PPE, and you've selected and provided that PPE to your employees, you have to make sure they actually use it when they are affected by the hazard. They haven't—my opponent— Their argument here is, as I understand it, right, that this was above and beyond what the regulation required, and that, in fact, no regulation required the consistent use of this harness, right? I mean, to the extent you're relying on— your own argument is relying kind of on the reasonable activities of the regulated party, here they're saying, look, we reasonably thought we didn't have to use it because OSHA never told us specifically we had to use it. Yes, Your Honor. Let me clarify. So, first of all, the question of whether they violated the standard is not on appeal. It was not challenged. So the ALJ found below, they violated the standard. What did you just say? I said that the ALJ found that they violated the standard. They did not appeal that determination. They have appealed only— They just repealed the notice, right? —whether they had constitutionally fair notice that they were required to oblige the standard. They never—they've not at any point contested in their opening brief or in their petition purview. I consider it under review. Well, be that as it may, Your Honor, they have admitted to all the facts that make it— The properly determined petitioner willfully violated the standard. Your Honor, they have— That concludes violation and willful violation. Your Honor, we're interpreting it as the willfulness characterization. They listed two issues on appeal in their opening brief, Your Honor. You can convince my colleagues, but I think I don't accept that. As far as I'm concerned, the whole kit and caboodle is under review, is preserved for appeal. Well, then to that issue, sir— I want to ask you how this rule— why this rule extends to equipment at a building that can only be— where the PPE can only reach two to four cars, and it has to deal with a 20-car train in a situation where you can't break them up and wheel them in four at a time. Your Honor, let me clarify that. So there are several standards that— Are you going to answer the question? Yes, sir. Yes, sir. Yes, sir. So your question first would like me to address the practicality of— How can this decision, how can this rule— as far as I'm concerned, this is an FRA preempted situation. Your Honor, that's another issue that they have not appealed. That was an affirmative defense below before the ALJ. They chose not to appeal the rejection of the preemption defense. They raised FRA discussion— It's a document that says they chose not to appeal it other than the statement of issues on appeal. There's nothing in the opening brief, Your Honor, that challenges the preemption determination on its face. They didn't even raise it in their petition for discretionary review to the commission, which is necessary for this Court to have jurisdiction over the question. If the rule has been applied to a situation that can't be served from a fixed structure, then the preemption issue is here. All right. Well, I would like to first address, if I may, this. I think you mentioned the feasibility of using fall protection in this circumstance.  I thought that's what perhaps you were getting to, sir. I said how—I didn't want to talk about feasible. It's not feasible. How can the rule apply to a situation where it's not feasible? Your Honor, feasibility was not challenged in this case. They admitted it. On transcript page 351 and 352, their corporate safety director said, yes, it was feasible to install. It was feasible to use. If you can't answer the question, fine. I'm sorry. What is the question, sir? I'm missing it. I apologize. Well, they didn't have a situation. It was not a situation, as I understand it, where you could load four cars from the structure, and a train could then push the next four cars up so it could be loaded.  And, in fact, your client didn't even allege a violation for the last 16 cars, or however many there were that day, which tells me the rule is not being rationally applied. Your Honor, it was feasible and possible and was done that they would work in cars in groups of three or four. That's cited in our brief. That's testimony from Mr. Schmidt, Mr. Umstadt, and Mr. McMullen. They explained that that's where the – so that's how this facility is designed. The railcar loadout area is a discrete area next to the grain bins, and that is where the fall protection system is installed. You have to have it there because there are spouts that bring the grain from the bins into the railcar. And there is a walkway next to the scale house where you control the flow of grain from the bins into the railcar. They would walk up the walkway, put down a retractable, you know, step, and then they would step onto the railcar. When they stepped onto the railcar, they were underneath the fall protection system, and the requirements of the company was to hook it up and use it. They could walk 20 cars, right? Well, they were not supposed to do that. They were supposed to work on it in groups. Would it be appropriate to say, did the train have to move when it was to fill the cars? In other words, I'm trying to envision what this looked like. Do you have the four cars that are underneath the fall protection system? Then you've got 16 other cars that are outside of it, right? Is that accurate? Well, I don't think they ever – you couldn't fit 20 cars on a track. I think that was in our brief clarifying that fact. There's maybe 14 at most.  Well, there are other ones. And then the employee would walk along the train opening those. In order to fill those, did the train have to move underneath? No. You were meant to park there, open the lids, have the grain come into the spouts, close them, and then work on three or four more cars. They just chose not to follow that system because it was more convenient to not use it. How did the spouts – the spouts must have been mobile, or there were 14 spouts. My undertowning is they were fixed. There were only so many spouts. And that's why you were meant to work on them in three or four. What's that? They couldn't have been on the structure if he could have walked – if he could have done all 14 cars without the train moving. He can't do – Your Honor, they can't do all 14. They can only do the ones parked under the spouts. See, and that's the thing. So they've got to move the four cars to get to the next four cars. Right. So it takes longer, right? So it takes longer. And that's why they didn't use it. That's what I was trying to ask you. Right. And I maybe botched the question, but they need to move the train anyway in order to fill the whole train. Yes, Your Honor. The train's going to move, right? Yes. And whether they open up all 14 cars or they do the three cars that are – or four cars they can reach with the spout or not, they're still after whatever those four cars are done. That's as far as that spout is able to move the grain, right? Right. They have to do it – the loadout has to occur, the actual filling of the cars in that spot where the fall protection system is located. And the testimony bears this out. They said, yes, we were supposed to use it the whole time. We were supposed to walk up, hook up, and then do the work and then get down when it was time to move the trains. But they didn't want to because it took longer. They said that after the explosion, they had to replace this system with a brand-new one that looked essentially the same, and according to Mr. Umstadt, they used it religiously. So they didn't need to forego use of this fall protection system. They had just chosen not to collectively as a group because it slowed them down. They had problems with it not because they had to move the train, but they didn't like to have to wear the protective equipment away from the building. That was in the record as well, is that they didn't – well, they didn't – they didn't have – they had issues with the actual equipment itself, like it sort of catching, which is sort of a maintenance issue and can happen with any protective equipment. And then they also just – they didn't want to take the time to readjust the train so they would be doing the entire process underneath the fall protection system. And really, as I was reading it, it looked like you could pretty much guarantee to do two cars, but once you got beyond two cars, the system would gum up because you started to walk further away, and the further away you got, the system was unreliable, right? And so, you know, truthfully, with the system the way it was, maintained the way it was, they should have been filling two cars, move the train, fill two cars, move the train, fill two cars, fill the train, right? And they looked at that and said, that seems to be a whole lot of effort. Well, I think there were – there was testimony about it not working optimally at certain points, but they did say that after the explosion they were able to use it religiously and this wasn't an issue. So it's no longer – you know, they demonstrated after the fact that this was feasible the whole time, and that's perhaps why they didn't challenge the actual feasibility as applied to this case at any point in the litigation below. You know, the safety director testified this was feasible. So how is what you just said in the record unappealing? Say again? They demonstrated after litigation that it was feasible. Transcript pages 251 to 253. And who's testifying? That's Mr. Unschott. He's the person who did the majority of this work on top of the trains. He's discussed on page 4 of the ALJ's decision. And so is that fact as well. I want to clarify a few more things because I am running short on time. And where to start. I think – so Hoffman Construction. There's all this discussion about these general PPE standards, 1910-132A. Hoffman Construction concerned 1926-28A, which was since revised. That was an old version. Those are not at issue in this case. They are very different from the standard at issue in this case. Those impose a broad requirement on employers to just use PPE when it's necessary to protect from hazards. And there's a notice problem there. And the way that courts have dealt with this notice problem is impose a reasonably prudent person test, a reasonable foreseeability test. You can see this court doing that in the Arkansas Best Freight decision that's cited in our brief. That inquiry is not necessary here because there is no dispute that there was a hazard necessitating the use of PPE. Even the cases that my opponent cites, Cape and Vineyard, make that point. They say if there is knowledge of the hazard, there is no notice problem. So even if those cases were applicable, they would lose because they are – were fully well aware that there was a potentially deadly fall hazard on top of these rail cars. That's why they installed the fall protection system. That's why they formally required employees to use it. They just allowed this culture of noncompliance to take shape at the Adrian facility. You mentioned before, Judge Corbis, that they have said they went above and beyond OSHA regulations. That's sort of a new argument for them. Throughout this litigation, they have argued that they were just confused by the Miles memo and subsequent statements. They never affirmatively made the case. And we actually looked at the law and we thought that we went above and beyond. The only person who said anything like that was Mr. Thiessen, this corporate safety consultant. His testimony was completely noncredible on this point. He could not give a cogent explanation. This is Mr. Stanley Thiessen. He is a corporate safety – Thiessen, T-H-E-S-S-E-N. He admitted that, you know, they were exposed to a fall hazard. They had to use this system. It was, you know, not using it exposed them to penalties for noncompliance. He admitted that it was feasible to use, that the Miles memo says you could be cited in these circumstances. But then he nonetheless tried to say, but maybe, you know, OSHA regulations don't actually require it. You know, it's sort of a walking, working surface. And I see that the Miles memo says you won't be cited under subpart D. I know subpart D isn't subpart I, but, you know, maybe. And that's just not a cogent explanation and a reason – and a genuine belief that they were not – they weren't aware of their – the required conduct. Would you remind me of the agency's response to the argument that in the notice of proposed rulemaking, I don't remember which one, that ultimately did not result in a rule. The agency says the Miles memorandum is confusing. People don't know what it means. Yes, Your Honor. I don't – I'm sure you answered that, but I don't recall off the top of my head what your response is to that. Because that has a certain appeal to it. Yes. That is certainly the one sentence that they have found that could plausibly cause any confusion. So that came in the 2010 notice of proposed rulemaking for the walking, working surfaces regulation. It was describing the history of OSHA's regulation of this hazard. It was saying that in 1990, OSHA had put out a notice of proposed rulemaking that would have exempted certain equipment, including rolling stock, from subpart D, the walking, working surfaces section. In 2003, the agency reopened the rulemaking record to get more information about that particular subject. They said, we want more information from the public on the appropriate scope of subpart D. So then, when recounting those activities, what OSHA said was, we had issued the Miles memo in 1996. We recognized that there was this lack of clear direction. As a result, we put out this 2003 request for more information about the appropriate scope of subpart D. Nothing about subpart I, which is what we're dealing with here. There's no discussion – there's no evidence there, no insinuation that there was confusion about the scope and the applicability of the PPE standards that have, you know, that were in place. Moreover, none of those statements suggest that OSHA was moving away from the Miles memo itself. The result of that statement was not, and we're changing our position, and we're tweaking the memo, or we're rescinding the memo. They merely said, so send us some more information. We're going to consider whether to put out a proposed rule that specifically addresses this topic. In 2016, they then, when they concluded that rulemaking, said again, there's nothing in here that changes the landscape for rolling stock specifically. Current existing enforcement policies, i.e., the Miles memo, remain in effect. I have 20 seconds, so I just want to say for the last bit that this is as applied. They do not challenge factually that this is the exact circumstance that the Miles memo is talking about. They do not contest that this is a situation where rolling stock is located next to and contiguous to a structure, and fall protection was feasible. They are trying to sustain this claim based on potential ambiguities to other parties, which this Court has said, the Supreme Court has said, in Holder v. Humanitarian Law Project in 2010. This Court has relied on that statement. You cannot bring a vagueness challenge based on the potential ambiguity to others, and that's what MFA is trying to do here. Thank you. Thank you, Your Honors. I don't have much time left, but what I would say is that the 2010 notice of rulemaking, we don't believe that caused the confusion. We believe that that acknowledged the confusion. And what the rulemaking record demonstrates is that there is a lack of consensus in the industry about what types of fall protection would be necessary for work atop rolling stock. And that comes down to, you know, we do not believe that it's clear what the feasibility requirement is. We think that the fall protection system that was put in place was not necessitated, that it was trying to enhance safety for the workers. But it was not necessitated. There are other things that could. You ran on the other side, just mentioned this is an as-applied, and we've kind of used that in our discussion. Do you agree this is an as-applied challenge, or would you suggest otherwise? I would agree that I believe that there's not fair notice of what is required of the regulation itself. You're saying, no, you're suggesting this is more of a, maybe not a precise term here, but a facial challenge. A vagueness challenge in that we did not have specific guidance in this case of what was required by the statute. So one last point. Is there anything in the record about how many structures like this there are in the country's rail system? There is not, Your Honor. Well, what about the provision in I that they're really arguing about? And they're talking about that, that say that one of your duties is to select the PPE. Once you select the PPE, it's your duty to have the employees use the PPE. And that's really kind of the heart of their argument, is you selected it. You put it there. You had an obligation to make sure the employees used it. Well, Your Honor, our view is that there wasn't the kind of assessment that we think that rule is predicated on. There's no written assessment. There's no, you know, official statement of what an assessment was. We tried to put something in place that we thought would enhance safety protection. There's nothing in the record that demonstrates that my client thought that that system was necessary. There are other safety precautions that were in place that we believe were sufficient. And this is a case, there was no injury here. There was no fall. There was no record of previous falls. We believe that what was in place, the, you know, not allowing employees to work on the top of the rail cars while they're moving, that was sufficient to protect their safety from the fall. Thank you, Your Honor.